BLANK ROME LLP
Attorneys for Diane Davis
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000
Michael Z. Brownstein
Scott F. Budzenski

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------  x
In re:                                                  :
                                                        :    Case No. 10-16722 (SCC)
TREVOR P. DAVIS,                                        :
                                                        :    Chapter 11 Case
                          Debtor.                       :
------------------------------------------------------  x
```

**MOTION OF DIANE DAVIS SEEKING ENTRY OF AN ORDER (I) PURSUANT TO 11 U.S.C. §§ 1104(a)(1) AND (a)(2) DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, (II) ESTABLISHING A BUDGET FOR THE DEBTOR AND (III) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1) TO PERMIT THE MATRIMONIAL ACTION TO PROCEED TO JUDGMENT ON ALL ISSUES**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Diane Davis ("Mrs. Davis"), wife of the debtor and debtor-in-possession ("Debtor") in

the above-captioned chapter 11 case, by and through her undersigned counsel, Blank Rome LLP

("Blank Rome") hereby submits this motion (the "Motion") seeking entry of an order (i)

pursuant to sections 1104(a)(1) and (a)(2) of title 11, United States Code, 11 U.S.C. §§, et seq.

(the "Bankruptcy Code") directing the appointment of a chapter 11 trustee to manage and

oversee the Debtor's estate, (ii) establishing a budget for the Debtor to halt the rapid dissipation

of assets and (iii) modifying the automatic stay pursuant to section 362(d)(1) of the Bankruptcy

Code to permit the Matrimonial Action (defined below) to proceed to judgment on all issues,

including equitable distribution, with enforcement to take place in this Court during the

pendency of this case and approving the Stipulation (defined below) annexed hereto as Exhibit "A". In support of her Motion, Mrs. Davis respectfully represents as follows:

<u>PRELIMINARY STATEMENT</u>

1.      The totality of facts now of record clearly establish, at a minimum, grounds for the appointment of a chapter 11 trustee in this case under sections 1104(a)(1) and (a)(2) of the Bankruptcy Code, based upon acts of recklessness, incompetence and gross mismanagement, all as explained below, by the Debtor in connection with the management of estate assets and the Debtor's businesses, both before and after the commencement of this case. In addition to the appointment of a chapter 11 trustee to handle the Debtor's intertwined personal and business affairs, the Court should also require the trustee to establish a reasonable budget for the Debtor in order to halt the rapid dissipation of assets. As further described below, the value of assets under the control of the Debtor have been eroding at an alarming rate. A chapter 11 trustee could step into the Debtor's shoes and cause assets to be disposed of in a rational manner. If an independent professional is appointed as chapter 11 trustee, Mrs. Davis believes that this case could come to a quick and rational conclusion with all creditors being paid in full and no further waste of assets would occur.

2.      In addition, the Court should modify the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code to permit the Matrimonial Court[1] to conclude the Matrimonial Action by issuing rulings on the matrimonial issues, including equitable distribution, but leaving enforcement of any judgments to this Court during the pendency of this case. As noted below, similar relief has been granted by this Court and by the Bankruptcy Court for the Eastern District of New York. The Debtor, as the plaintiff in the Matrimonial Action, is the party who initially

---

[1]  Capitalized terms used in the Preliminary Statement and Summary of Argument that are not otherwise defined therein shall have the meanings ascribed to them in subsequent parts of the Motion.

130664.00601/7002611v.6

commenced the Matrimonial Action. The Debtor has continued to prosecute the Matrimonial Action, which he commenced, uninterruptedly since he filed this case.[2] The Matrimonial Action has unproductively dragged on for over two years. It is essential that the Matrimonial Action come to a conclusion, especially because, as explained in detail below, the Debtor has been causing the rapid dissipation of assets.

3. The Debtor and Mrs. Davis have been engaged in extensive negotiations in an attempt to reach a global settlement regarding the relief requested by this Motion as well as the various matrimonial issues. Unfortunately, negotiations have reached a stalemate. Although it is clear that the parties cannot reach a settlement on the most significant matrimonial issues, just prior to filing this Motion the Debtor agreed by Stipulation signed on March 29, 2011 that the automatic stay should be modified to allow unrestricted continuation of the Matrimonial Action, that the Matrimonial Claims should be deemed nondischargeable debts and that Mrs. Davis should be exempted from the need to file proofs of claim until the Matrimonial Court has had an opportunity to determine the Matrimonial Claims. Rather than continuing forward with negotiations which have proven to be contentious, unproductive and time consuming, Mrs. Davis felt compelled to seek the relief requested herein by Order of this Court.

## SUMMARY OF ARGUMENT

4. In light of the rapid dissipation of assets, if the Debtor were not an individual chapter 11 debtor, Mrs. Davis' matrimonial counsel is certain that the Matrimonial Court would have already appointed a receiver or issued a restraining order on assets. Nevertheless, as further explained below, because the Debtor's LLCs, where he keeps virtually all of his personal wealth,

---

[2] Neither counsel for the Debtor nor counsel for Mrs. Davis believe that the stay is applicable to the Matrimonial Action, at least with respect to the actions each have taken to date. However, in light of certain concerns raised by the Matrimonial Court as explained below, counsel for Mrs. Davis thought it prudent to seek an order of this Court modifying the stay in the event that the Matrimonial Action must proceed to trial.

130664.00601/7002611v.6

are non-debtors, this Court does not have full control over the LLCs. As a result, the Debtor has been able to manipulate both the matrimonial and bankruptcy processes in such a way that there is virtually no oversight or control over the rapid dissipation of assets that may be available to his creditors and to Mrs. Davis. These are clear litigation tactics that should not be permitted and this Court has the power to stop him by modifying the stay and appointing a chapter 11 trustee.

5.     The Debtor is an individual who is self-employed as a real estate developer. The Debtor currently has no income and virtually no non-exempt assets other than his membership interest in his numerous LLCs of unknown value. Although the Debtor's real estate development business has no income, he irrationally refuses to cut unnecessary expenses and continues, for example, to maintain offices that cost approximately $14,000 monthly rent.

6.     Upon first glance at the Debtor's disclosures in his bankruptcy case, one might get the impression that the Debtor is in dire need of the relief afforded by the bankruptcy process. However, upon further review of the Debtor's financial structure as well as the lifestyle he has led and continues to lead as a chapter 11 individual debtor, the Debtor's need for such personal relief comes into serious question. As will be demonstrated below, the Debtor has structured his affairs in such a way that he has been able to reap the benefits of the bankruptcy process without abiding by its attendant restrictions.

7.     Virtually all of the Debtor's personal wealth is housed in the numerous LLCs he owns and controls (as detailed in paragraph 21 below). However, because the Debtor has only filed for chapter 11 relief in his individual capacity while his numerous LLCs remain non-debtors, the Debtor has been able to avoid disclosing the vast majority of the facts set forth below that are especially relevant to this Motion and are essential to gaining a full understanding of this case. By conveniently keeping his LLCs out of bankruptcy and seemingly attempting to

4

avoid this Court's scrutiny, the Debtor has blatantly frustrated his creditors' right to the full financial disclosure that is fundamental to the bankruptcy process. The appointment of a chapter 11 trustee and the imposition of a reasonable budget would provide the transparency that is essential to the bankruptcy process and also ensure that assets that may be available to creditors are no longer fruitlessly squandered.

8.     Despite the fact that the Debtor felt the need to file for relief as a chapter 11 individual debtor and that his disclosures in this case paint a bleak financial picture of his affairs, he nevertheless lives an extraordinarily lavish lifestyle which includes, among other things, a $40,000, 7-day vacation to the South of France this past summer, a $50,000, 2-week vacation to Anguilla this past December, an 8-day trip to South Africa and Geneva,[3] the recent purchase of a $65,000 car for his son, a $7,500 per month rental apartment on Park Avenue in addition to frequent stays at opulent New York City hotels and, last but not least, dining at exclusive New York City restaurants on a nightly basis. Although the Debtor has the use of two luxurious residences within New York City, he still frequently stays at the Carlyle Hotel in New York City. At a recent deposition held in November, 2010, Debtor testified that he stays at New York City hotels because it affords him "privacy." Although Mrs. Davis has been informed that the Debtor recently caused the sale of various vehicles that were at his disposal (including a Maybach, a Bentley, a Mini Cooper, a rare limited edition BMW and more than 20 farm and construction vehicles), the Debtor continues to drive his choice of an Aston Martin or Ferrari which are owned by an LLC he owns and controls.

9.     Although the Debtor personally has no income and almost no personal assets, all of his personal finances appear to be funded through his various and numerous LLCs. These

---

[3] While this trip was originally supposed to be a 4-day trip to South Africa for a funeral, the Debtor turned it into an 8-day whirlwind trip including an unnecessary stop in Geneva.

130664.00601/7002611v.6

LLCs pay for virtually everything the Debtor does and they own almost everything he uses in his everyday life including primary, secondary and vacation residences, automobiles, gifts to family members and even food from the grocery store. Virtually nothing is in the Debtor's name and because the LLCs are non-debtors, he has been able to avoid providing the Court and his creditors with a clear picture of their assets, liabilities and expenditures, notwithstanding that the LLCs are inextricably intertwined with the Debtor's personal financial affairs. The Debtor has been using the bankruptcy process as a shield to obfuscate creditors' ability to realize on these non-debtors' assets and prevent full disclosure of relevant financial information. The Debtor's actions are clearly litigation tactics that have significantly clouded what is otherwise supposed to be a transparent bankruptcy process.

10. The Debtor's LLCs own substantial assets which are managed by the Debtor himself. These assets are marital property that Mrs. Davis has valid claims to and such assets may also be available to the Debtor's creditors in this case. The LLCs are losing substantial value as a result of the Debtor's risky business decisions. Furthermore, the Debtor's business decisions in connection with the management of his LLCs have not only caused the dissipation of assets at an alarming rate but they have also placed the home that Mrs. Davis and the Debtor's children live in at risk of foreclosure.

11. This risk of foreclosure arose when, without Mrs. Davis' knowledge, the Debtor recklessly agreed to certain cross default provisions in a mortgage on the family home with loans to other business related entities he controls; specifically, loans to LLCs that own approximately 250 acres of valuable land with improvements in Pawling, New York. Due to certain mortgage and forbearance agreement defaults and cross defaults in connection with the Pawling Property and the Debtor's family home, it is necessary that the Debtor immediately cause the sale of the

entire Pawling Property. If the Pawling Property is not sold or the defaults are not otherwise cured, the family home is at risk of potential foreclosure. It is important to stress that the family home houses not only Mrs. Davis but also the Debtor's four children.[4]

12.     Although the Debtor claims to have been marketing for sale the entire 250 acres of the Pawling Property, it appears that he has only been marketing an 85 acre portion of the property known as the "World Class Equestrian Estate" and has been avoiding the immediate sale of the remaining approximately 165 acres. To date, although it is a necessity, the Debtor has not shown a good faith effort at marketing and consummating a sale of the entire Pawling Property.

13.     Mrs. Davis believes that the Debtor has intentionally failed to market the remaining 165 acres of the Pawling Property for undisclosed reasons. In the past, the Debtor had unsuccessfully planned to develop a real estate project consisting of what he called "Farm Villas" on the remaining 165 acres of the Pawling Property for sale prices starting at $2 million. However, the local municipality rejected the Debtor's Farm Villas plan due to a lack of community support. Regardless of what the Debtor's future plans are with respect to the Pawling Property, delaying the sale places the Debtor's family's home at risk of potential foreclosure and continues to deplete remaining assets. Among other things, a chapter 11 trustee could step into the shoes of the Debtor and take appropriate steps to cause an immediate sale of the entire Pawling Property which would alleviate much of the financial distress the Debtor and his family is facing.

14.     The appointment of a chapter 11 trustee and the establishment of a budget are not only warranted but are a necessity in this case. A chapter 11 trustee would provide fundamental

---

[4] Two of the four children are away at college; however, they reside full-time at the family home when classes are not in session.

transparency in the bankruptcy process, realize assets that may be available to creditors, halt the Debtor's frivolous spending and discontinue the fast-paced dissipation of assets.

## STATEMENT OF FACTS

14.     On December 21, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court (the "Petition Date").

15.     No committee of creditors has been appointed pursuant to section 1102 of the Bankruptcy Code.

16.     To date, no plan of reorganization has been filed in this case.

17.     The Debtor is an individual who currently manages his affairs and operates his businesses as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

18.     Mrs. Davis is the Debtor's estranged wife. The Debtor and Mrs. Davis are parties to a pending matrimonial action which was initially commenced by the Debtor (the "Matrimonial Action"). The Matrimonial Action is currently proceeding before the Honorable Laura E. Drager in the Supreme Court of the State of New York, County of New York (the "Matrimonial Court") under Order No. 309415/09. Mrs. Davis is a creditor in the Debtor's case in connection with, among other things, a pendente lite support order issued by the Matrimonial Court on December 9, 2009. Pursuant to the December 9, 2009 Order, the Debtor is directed to pay to Mrs. Davis or on her behalf the following: (a) $17,000 per month as unallocated tax free support[5]; (b) carrying charges on the New York apartment, mortgage, maintenance, utilities, insurance premiums for medical coverage,[6] homeowners and car insurance, expenses for the farm properties in Pawling,

---

[5] The Debtor has not complied with the pendente lite support order as he consistently makes random and unexplained deductions to monthly support payments.

[6] Mrs. Davis does not know if the Debtor has kept current on the mortgage or insurance premiums as she has not been provided with that information.

130664.00601/7002611v.6

New York, including wages of a domestic staff in Pawling and a housekeeper for the New York apartment. The Matrimonial Court has not yet made a determination with respect to equitable distribution, which is contested, and the parties are directed to appear for Conference in June, 2011 unless this Court modifies the stay at which time the Matrimonial Court will expedite the Matrimonial Action which has been pending since late 2008.

19.     Although the Debtor and Mrs. Davis have been engaged in negotiations in an effort to reach a global settlement regarding the various matrimonial issues as well as the relief requested by this Motion, it is clear that the parties have reached a stalemate with respect to the most significant issues. Nevertheless, the Debtor has agreed pursuant to a stipulation (the "Stipulation") executed on March 29, 2011, just prior to filing this Motion, that (i) the automatic stay should be modified to allow unrestricted continuation of the Matrimonial Action but leaving enforcement of any judgments to this Court so long as this case is pending, (ii) that the Matrimonial Claims[7] should be deemed nondischargeable debts notwithstanding whether such debts are enumerated as exceptions to discharge in section 523 of the Bankruptcy Code and (iii) that Mrs. Davis should be exempted from the need to file proofs of claim until the Matrimonial Court has had an opportunity to determine the Matrimonial Claims. Although the Stipulation was a step in the right direction, it falls far short of a global resolution as the parties have not been able to resolve the most significant matrimonial issues. By this Motion, Mrs. Davis requests that the Court approve the Stipulation, a copy of which is annexed hereto as Exhibit "A".

20.     The Debtor is a self-employed real estate developer of luxury apartment buildings and has developed certain buildings, primarily on the Upper East Side of Manhattan. According

---

[7] Capitalized terms used in this Motion that are not otherwise defined herein shall have the meaning ascribed to them in the Stipulation.

130664.00601/7002611v.6

to the Debtor, he invested a substantial portion of his liquid assets in two development projects at perhaps the worst time in the last 35 years. In addition to these investments, the marital estate consists of (a) the family residence, a six bedroom luxury apartment in Manhattan titled in the name of a corporate entity owned solely by Debtor; (b) adjacent farm properties in Pawling, New York (part of the this property is a working farm on which the Debtor bred cattle and over 20 horses are boarded)—title to the real estate in Pawling is held in the name of several corporate entities all controlled by the Debtor; (c) a vacation home in Anguilla; and (d) various accounts all titled in corporate names and controlled solely by the Debtor.

**The Debtor's Bankruptcy Disclosures Regarding His Financial Affairs**

21.     The Debtor's schedules list various real estate investments as assets, including his 100% direct ownership of (i) Sivad Newco LLC, (ii) Lex 65 LLC, (iii) Cogi LLC, (iv) Quaker Hills LLC, (v) Quaker Hill X LLC, (vi) Quaker Hill XX LLC, (vii) 859 Lex LLC, (viii) 132 East 65 LLC, (ix) Davis Development Holdings LLC, (x) D&T Holdings LLC, (xi) Lex Funding LLC and (xii) IGOC I Park Member LLC (collectively, the "Directly Owned LLCs"). In addition, the Debtor's schedules also list as assets his 100% indirect ownership of (i) IGOC I Park LLC (it appears that IGOC I Park Member LLC is the 100% direct owner of IGOC I Park LLC) and (ii) 1055 Park Avenue LLC (it is unclear which entity or entities are intermediary) (collectively, the "Indirectly Owned LLCs" and together with the Directly Owned LLCs, the "LLCs").

22.     The Debtor's schedules list the value of his ownership interest in each one of the LLCs at either zero or "unknown" with the exception of Lex Funding LLC, which is given a value of approximately $3.4 million held in a bank account at Aegis Capital. The only other indication of value with respect to the LLCs as disclosed in the schedules is that Sivad Newco LLC owns an apartment located at 188 East 78th Street and two bank accounts, one at Aegis

130664.00601/7002611v.6

Capital with an approximate balance of $4.42 million, and one at Bank Rothschild with an approximate balance of $3.96 million (which balance collateralizes a margin loan to Lex Funding LLC in the approximate amount of $1.45 million).

23.    Aside from the Debtor's equity interests in the LLCs, the Debtor's schedules do not disclose any other assets except for certain assets of a relatively <u>de</u> <u>minimus</u> nature including $500 in petty cash, $4,000 in a bank account at Signature Bank, $1,000 in wearing apparel, $7,500 in wrist watches and $95,384 in an IRA at Signature Bank, all of which the Debtor claims as exempt except for the petty cash.[8]

### The Debtor's Financial Affairs Have Not Been Fully Disclosed in This Case

24.    There are a multitude of relevant facts regarding the Debtor's finances that may not be known to this Court or other creditors in this case due to the overall structure of the Debtor's financial affairs and his systematic use of non-debtor LLCs.  Because the LLCs are non-debtors, the Debtor's schedules and other filings do not provide the kind of full financial disclosure that would be required of a chapter 11 debtor despite the fact that the LLCs house virtually all of the Debtor's personal financial wealth.

25.    The Debtor has structured his affairs in such a way that he personally owns almost nothing.  All of the Debtor's personal finances appear to be filtered though the numerous LLCs he owns and controls.  The LLCs appear to own and/or finance every aspect of the Debtor's personal life, including, without limitation, primary, secondary and vacation residences, exotic automobiles and vacations, lavish gifts to family members, expensive dinners and hotel stays, and generally all of his personal living expenses.

---

[8] The personal property values scheduled by the Debtor are extraordinarily minimal and Mrs. Davis believes there are significant inaccuracies.  For example, according to an April 28, 2010 appraisal, the Debtor's wrist watch collection was valued at approximately $83,000.   In addition, based on the Debtor's spending habits and credit card statements, it appears that the value of the Debtor's wearing apparel vastly exceeds $1,000.  Finally, Mrs. Davis is aware that the Debtor provides their children hundreds of dollars in cash each month.

26. As a result of the Debtor's financial structure, and because the Debtor's LLCs are non-debtors, the Debtor has been able to avoid disclosing the vast majority of the financial information creditors and other parties in interest would have a right to examine in an ordinary individual chapter 11 case. Although the bankruptcy process is premised on providing a debtor's creditors and other parties in interest with a clear picture of a debtor's finances, this is not an ordinary case. Because virtually every aspect of the Debtor's finances is filtered through non-debtor entities that are owned and controlled by him but are not in bankruptcy themselves, the Debtor has been able to manipulate the bankruptcy process by reaping its benefits without adhering to its intended requirements of full financial disclosure.

27. In connection with the pending matrimonial action, Mrs. Davis has made numerous requests for information from the Debtor. The Debtor has been limitedly responsive and much of the documentation Mrs. Davis has received to date is incomplete. Moreover, the Debtor has failed to adequately comply with orders issued by the matrimonial court regarding Mrs. Davis' requests for information. The Debtor has moved monies in and out of various accounts without Mrs. Davis' knowledge or consent and purportedly has invested funds in underperforming securities which have caused losses of several millions of dollars in a very short period of time. If the Matrimonial Action were permitted to proceed, the Matrimonial Court would likely take immediate steps to halt the depletion of such assets by the issuance of appropriate restraints. The Debtor has been permitted to proceed without interference to the detriment of Mrs. Davis and his creditors.

## Unaccounted for Dissipation of Assets

28. Based upon the information that has been provided to Mrs. Davis, the combined value of cash and marketable securities held by the Debtor and the entities owned and controlled

130664.00601/7002611v.6

by him was approximately $11.22 million on December 31, 2009. By September 30, 2010, that value had declined by more than $1.6 million[9] to approximately $9.6 million. Based upon the most recent information provided to Mrs. Davis, the value has further eroded by more than $2.1 million to an approximate current value of $7.5 million. Therefore, in just over a year, the combined value of cash and marketable securities held by the Debtor and the entities owned and controlled by him has declined by more than $3.7 million. Although Mrs. Davis has repeatedly requested and the Matrimonial Court has ordered that the Debtor justify and account for this tremendous reduction in value, the Debtor continues to place such funds in underperforming and risky investment instruments.

29.    Because of the complex structure of the Debtor's intertwined personal and business finances combined with the fact that Mrs. Davis has received incomplete documentation, it is impossible for Mrs. Davis or her professionals to gain a clear understanding of the Debtor's true financial landscape. Nevertheless, the bank records Mrs. Davis has received to date is of great cause for concern to her and certainly would be to the rest of the Debtor's creditors if they were aware of the information she has received.

## The Debtor's LLCs

30.    It is important to stress that neither the Debtor nor his LLCs currently have any income and, based upon the massive depletion in value noted above in the past year alone, it seems clear that the enterprise owned and controlled by the Debtor is failing. However, significant value may still be realized if the LLCs are operated and/or disposed of in a rational manner.

---

[9] Mrs. Davis understands that this decline is largely due to the fact that a Certificate of Deposit that was used to collateralize a mortgage on the Empire Residence (defined below) was called by the bank and applied to reduce the balance of the debt.

The Condominium Project

31.     Among the assets owned by the LLCs is the condominium project located at 1055 Park Avenue (the "Project").  The Project is substantially complete; however, the building is sitting vacant due to a dispute between the senior lender, the junior lender and the Debtor.  The Project and the underlying dispute was brought to this Court's attention when Zimco Holdings LLC ("Zimco"), the junior lender in connection with the Project, filed its motion seeking a Bankruptcy Court supervised sale of the five apartment units in the building [Docket No. 23]. Mrs. Davis understands that the Court does not have jurisdiction to order the sale of the apartment units and it is obvious that the senior and junior lender have reached an impasse.  In fact, on March 29, 2011, the senior lender filed its own motion seeking relief from the stay to pursue foreclosure [Docket No. 44], which is scheduled to be heard on the same date as this Motion.   However, Mrs. Davis believes that the Project could be completed if the Debtor were willing to make reasonable accommodations to the senior and/or junior lender.   To date, it appears that the Debtor is unwilling to make any such accommodations and the Project continues to accrue unnecessary costs and lose significant value on a daily basis.  Mrs. Davis believes that a chapter 11 trustee would be able to facilitate a resolution of the impasse between the parties which would allow the Project to be completed.

The Anguilla Property

32.     An unfinished vacation home in a high-end development in Anguilla is another of the several valuable assets owned by the Debtor's LLCs (the "Anguilla Property").  According to the information provided to Mrs. Davis, although somewhat unclear, it appears that the Debtor invested approximately $4 million in the Anguilla Property and an additional approximately $2 million is required to complete construction.  If the Anguilla Property were completed, it appears

that it would be worth approximately $6 million. Other similar uncompleted properties in the same development have sold for approximately $2.5 million. Mrs. Davis believes that a disinterested chapter 11 trustee would be able to make a rational business decision as to whether value would be maximized by selling the Anguilla Property "as-is" or investing additional capital and selling it as a completed project.

The Pawling Property

33.     Another significant asset owned by the LLCs is a massive parcel of land located in Pawling, New York (the "Pawling Property"). The Pawling Property consists of approximately 250 acres and includes a working farm, a world-class equestrian center and at one time a palatial home the Debtor constructed for approximately $25 million. The farm and equestrian center, which are currently operating at a significant loss, are staffed with several employees, house horses and valuable equipment and produce some income from boarders and tenants. The main house that was located on the property however has burned to the ground as a result of a fire. At the time of the fire, there were various items of significantly valuable personal property located in the house including a rifle collection, artwork and hunting trophies. Although the house burned down approximately two years ago, the Debtor has not disclosed to Mrs. Davis exactly what personal property survived the fire or where such property is currently located. The house, although insured, is currently the subject of a lawsuit with the insurer regarding the claim for loss due to fire.

34.     Although the Pawling Property generates some income, it incurs immense costs and expenses. It is not a profitable enterprise; in fact, the Pawling Property currently operates at a loss of approximately $8,000 to $10,000 per month, which does not include interest on debt that continues to accrue. The Pawling Property is also encumbered by a mortgage in the

approximate amount of $23 million, which is in default and subject to a forbearance agreement which is also in default. Moreover, as further explained below, due to certain cross defaults between the debt on the Pawling Property and the Empire Residence (defined below) where Mrs. Davis and the Debtor's children reside, the Empire Residence is at risk of potential foreclosure.[10] As a result of these defaults and cross defaults and the fact that the Pawling Property is only incurring losses and subjecting the Debtor's family's home to potential foreclosure, the only rational option is to immediately sell the Pawling Property. To date, although the Debtor claims that the Pawling Property has been marketed for sale, a potential sale does not appear to be on the horizon and Mrs. Davis does not believe that the Debtor has made a good faith attempt to market the entire Pawling Property. In fact, the Debtor has only been able to produce marketing material with respect to 85 acres of the approximately 250 acres encompassed by the Pawling Property. Mrs. Davis does not believe that the Debtor has made any effort to sell the remaining 165 acres of the Pawling Property.

35.     Further, Mrs. Davis believes that the Debtor has recklessly neglected to market the remaining 165 acres of the Pawling Property for undisclosed reasons. In the past, the Debtor had unsuccessfully planned to develop a real estate project consisting of what he called "Farm Villas" on the remaining 165 acres for sale prices starting at $2 million. However, the local municipality rejected the Debtor's Farm Villas plan due to a lack of community support. Regardless of what the Debtor's future plans are with respect to the Pawling Property, delaying the sale places the Debtor's family's home at risk of potential foreclosure and continues the depletion of remaining assets.

---

[10] Mrs. Davis only recently became aware of these cross defaults and the fact that her home was put at risk of foreclosure.

130664.00601/7002611v.6

<u>The Empire Residence</u>

36.     Mrs. Davis and the Debtor's children reside at a condominium apartment unit of approximately 6,000 square feet located in the Empire Condominium Building at 188 East 78th Street in New York City, which is owned by one of the Debtor's LLCs (the "<u>Empire Residence</u>").

37.     As noted above, the mortgage on the Pawling Property as well as a forbearance agreement with respect thereto is in default.  When the mortgage default occurred, without Mrs. Davis' knowledge, the Debtor negotiated a forbearance agreement which contained certain cross default provisions with respect to mortgages on the Pawling Property and the Empire Residence. In connection with the forbearance agreement, among other things, the Debtor was required to either cause the entire Pawling Property to be immediately sold or turn over to the lender the proceeds of the insurance policy received from the fire.  If one of those two events did not occur by November of 2010 when the forbearance agreement expired, the lender would have the right to foreclose on either the Pawling Property or the Empire Residence.  As noted above, the Pawling Property has not been sold and the insurance proceeds from the fire are currently the subject of litigation.  As a result, the Empire Residence and/or the Pawling Property are at risk of potential foreclosure.[11]  Mrs. Davis only recently became aware of the cross default provisions which put the family home at risk.  Based on all of the foregoing, it appears that the Debtor makes a habit of nondisclosure.

38.     The Debtor has placed his wife and children as well as his LLCs in a precarious position.  The Debtor's failure to even make a good faith effort at causing the entire Pawling

---

[11] Mrs. Davis acknowledges that the automatic stay would first have to be lifted before foreclosure could occur; however, the risk of foreclosure is nonetheless present.

130664.00601/7002611v.6

Property to be sold is nothing short of sheer recklessness with respect to his family obligations and gross mismanagement of the LLCs with respect to their business obligations.

RELIEF REQUESTED

39.     Based upon the foregoing and for the reasons set forth herein, Mrs. Davis respectfully seeks entry of an order appointing a chapter 11 trustee pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code, so that this case can progress towards a rational and reasoned conclusion, in the best interests of the Debtor and his estate.  In addition, Mrs. Davis requests that the Court direct the chapter 11 trustee to establish a budget for the Debtor to prevent further dissipation of assets.  Finally, Mrs. Davis requests that the Court modify the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code to permit the Matrimonial Action to proceed to judgment on all issues, including equitable distribution, with enforcement to take place in this Court during the pendency of this case by approving the Stipulation annexed hereto as Exhibit "A".

APPOINTMENT OF A CHAPTER 11 TRUSTEE IS WARRANTED<br>UNDER SECTIONS 1104(a)(1) AND (a)(2) OF THE BANKRUPTCY CODE

40.     The appointment of a disinterested chapter 11 trustee is warranted under both sections 1104(a)(1) and (a)(2), based on the recklessness, incompetence and gross mismanagement on the part of the Debtor before and during this case.

41.     Section 1104(a) of the Bankruptcy Code provides, in pertinent part, that prior to confirmation of a plan and on request of a party in interest, a bankruptcy court shall order the appointment of a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

18

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor . . . .

11 U.S.C. §§ 1104(a)(1)-(a)(2) (emphasis added).

42.     A moving party has the burden to establish the need for the appointment of a trustee by clear and convincing evidence.  Adams v. Marwil (In re Bayou Group, LLC), 564 F.3d 541, 546 (2d Cir. 2009) (citing In re Adelphia Communs. Corp., 336 B.R. 610, 655-56 (Bankr. S.D.N.Y. 2006)).  However, "[t]he standards for the application of the two subsections of section 1104(a) 'are quite flexible and give the judge wide discretion in deciding whether there is cause to appoint a trustee.'"  In re Adelphia Communs. Corp., 336 B.R. at 656 ("The decision to appoint a trustee in a chapter 11 case is a factual determination left to the discretion of the bankruptcy judge.")  (quoting Alan N. Resnick, BANKRUPTCY LAW MANUAL § 9.29 at 954 (Thompson-West 5th Ed.).  See also In re Tradex Corp. v. Morse, 339 B.R. 823, 827-30 (D. Mass. 2006) (canvassing cases and noting that "as a practical matter, whether the party has met its burden has consistently been left within the discretion of the bankruptcy court" because reviewing courts regularly defer to the bankruptcy court's determination of whether a chapter 11 trustee is warranted).

43.     Section 1104(a)(1) sets forth a nonexclusive list of factual predicates that support a finding of "cause" for the appointment of a chapter 11 trustee, including "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management."  11 U.S.C. § 1104(a)(1); see also In re Marvel Entertainment Group, Inc., 140 F.3d 463, 472 (3d Cir. 1998) (stating that "the language of § 1104(a)(1) does not promulgate an exclusive list of causes

19

for which a trustee must be appointed . . . ."); In re V. Savino Oil & Heating Co., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

44.     Under section 1104(a)(1), appointment of a trustee is mandatory if cause is shown. See In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir. 1988) ("Once a court has found that cause exists under § 1104, it has no discretion, but must appoint a trustee."); V. Savino Oil, 99 B.R. at 525 ("Once the court has found that cause exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed."). The court may consider both prepetition and postpetition misconduct of the current management when making the determination that "cause" exists for the appointment of a trustee. 11 U.S.C. § 1104(a)(1); Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.), 4 B.R. 635, 644-45 (Bankr. S.D.N.Y. 1980).

45.     Even if a bankruptcy court does not find that "cause" exists to appoint a chapter 11 trustee under section 1104(a)(1), the court may still appoint a trustee if it is in the "interest of the creditors . . . and other interests of the estate" pursuant to section 1104(a)(2). 11 U.S.C. § 1104(a)(2); In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989) ("Subsection (a)(2) allows appointment of a trustee when no 'cause' exists."); In re Euro-American Lodging Corp., 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) ("Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no 'cause' exists"); In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (stating that section 1104(a)(2) "allows the appointment of a trustee even when no 'cause' exists.").

46.     Section 1104(a)(2) provides a more flexible standard for appointment and gives the court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests." Marvel, 140 F.3d at 474; Sharon Steel, 871 F.2d at 1226; Ionosphere, 113

B.R. at 168. In determining whether a trustee should be appointed under section 1104(a)(2), courts "look to the practical realities and necessities." Ionosphere, 113 B.R. at 168. Among the factors considered by courts are: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." Ionosphere, 113 B.R. at 168 (citations omitted); see also Euro-American, 365 B.R. at 427.

47.     There are many factual scenarios that have been held to support the appointment of a trustee under section 1104(a), including, but not limited to:

a.     a history of questionable transactions with companies affiliated with the debtor;

b.     failure to keep adequate records and provide prompt and complete reports or other required disclosures;

c.     acrimony between the debtor and its creditors;

d.     material conflicts of interest preventing the debtor from discharging its fiduciary duties to creditors;

e.     a lack of confidence in the debtor's abilities to manage its business and discharge its fiduciary duties;

f.     failure to pursue recovery of amounts owed from affiliates or other transactions constituting preferences or fraudulent conveyances;

g.     transfers on the eve of bankruptcy;

h.     unauthorized postpetition transfers of estate assets or other violations of section 363(b) of the Bankruptcy Code;

i.     inability of the debtor to formulate a business plan; and

j.     diversion of funds and misuse of corporate assets.

48.    In this case, the Debtor has committed most, if not all, of these enumerated acts, any one of which alone is sufficient to support the appointment of a chapter 11 trustee.  This confluence of actions only lends further support for the appointment of a trustee.

49.    Throughout the parties' Matrimonial Action, the Debtor refused to fully disclose his income and the extent of his assets.  Mrs. Davis contended that the marital estate, valued in excess of $100 million dollars, was in jeopardy of being depleted as a result of the Debtor's questionable financial dealings in or around 2005 and 2006.  The Debtor was bought out of several real estate partnerships, as a result of which he received in excess of $60 million dollars, which was in addition to the substantial assets already in possession of the Debtor.

50.    While no one could anticipate or accurately predict what was to happen in the 2008 real estate market, the Debtor's plans to build luxury apartments in New York City without iron clad financing reveals a lack of sound business judgment and an inclination to take risks that are inimical to the Debtor's family's well being and financial security and to creditors.

51.    Everything about the Debtor's financial circumstances is secretive and coveted, a fact not lost on the Matrimonial Court when it issued its December 9, 2009 pendente lite order.  At page 5 of the Pendente Lite Decision and Order (see Exhibit "B" annexed hereto), the Honorable Laura E. Drager stated, in part, as follows:

> The Husband is a real estate developer of luxury apartment buildings in Manhattan that are owned by corporate entities controlled by the Husband.  He also is engaged in a resort real estate venture in Anguilla, where the parties have an interest in a vacation home.  On his sworn statement of net worth he reports income of $7,500 per week from his real estate development business and interest income of $70,000 per month.  He does not indicate whether that income is gross or net after taxes.  The Husband has not submitted a copy of his most recent tax return, although it is required to be attached to the net worth statement. From the limited information provided by the Husband, it appears that he has income of at least $102,500 per month.

130664.00601/7002611v.6

Pendente Lite Decision and Order of the Matrimonial Court at page 5.

52.     The Debtor's repeated failure and refusal to provide information concerning his assets and income compelled Mrs. Davis to proceed, in the Matrimonial Action, by Order to Show Cause signed by the Honorable Laura E. Drager on June 4, 2010 for an order pursuant to CPLR § 3126, precluding the Debtor from presenting any evidence at trial with respect to the sale of any of his interests in business entities from which he earned in excess of $64 million dollars.  Mrs. Davis also sought judgment for arrears in the sum of $294,471.67 as a result of the Debtor's abject failure and refusal to comply with Court orders.

53.     To make matters worse, the Debtor refused to fully disclose the extent and location of certain offshore accounts held in the name of LLCs solely controlled by the Debtor. It was later discovered that the Debtor deposited several millions of dollars with Aegis Capital which is controlled by a close friend of the Debtor.  Without consultation with or knowledge of Mrs. Davis, the Debtor transferred in December 2009, a large amount of securities from Banque Rotschild to Aegis Capital.  Since then the Banque Rothschild accounts have balances of approximately $4 million (in the Sivad Newco LLC) and negative $1.5 million (in the Lex Funding LLC) for a net of $2.5 million.

54.     The Aegis accounts have rapidly declined according to the Debtor and millions of dollars have been lost.  The net balance in the Aegis account in September 2010 was $6.99 million.  In the most recent statements belatedly provided by the Debtor, the Debtor claims that $194,000 was spent and the remaining decline of close to $2.3 million in just a few months was due to declines in the bond market.  In sum, on December 31, 2009, the combined value of cash and marketable securities held by the Debtor and the entities owned and controlled by him was approximately $11.22 million.  By September 30, 2010, the value declined to $9.6 million.  In a period of only five months, that value has further decreased and the Debtor purportedly lost an

additional $2.1 million causing the net value to drop at an alarming rate to $7.5 million. Mrs. Davis seeks to prevent further hemorrhaging and thus seeks the appointment of a chapter 11 trustee to insure that no further funds are dissipated and/or depleted by the Debtor or anyone acting on his behalf. A careful review of the Aegis account statements may reveal further improper or questionable transfers or diversion of funds. As such, this is precisely the kind of case in which the appointment of a chapter 11 trustee is clearly warranted.

55.     In <u>re Oklahoma Refining Co.</u>, the United States Court of Appeals for the Tenth Circuit affirmed the appointment of a trustee under both sections 1104(a)(1) and (a)(2) where: (i) there was a history of questionable transactions with the debtor's affiliates; (ii) the debtor was making no effort to pursue amounts owed from affiliates; (iii) approximately $800,000 of proceeds from sales of inventory by debtor was diverted to a separate account rather than into the lender's bank accounts in order prevent the lenders from offsetting the funds; and (iv) the debtor failed to timely file or complete monthly operating reports as required by law. <u>Oklahoma Refining</u>, 838 F.2d at 1135. The court in <u>Oklahoma Refining</u> held that "[a] history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require." <u>Id</u>. at 1136. The court added that "failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee." <u>Id</u>.

56.     In <u>re Sharon Steel Corp.</u>, the United States Court of Appeals for the Third Circuit affirmed the appointment of a trustee under both sections 1104(a)(1) and (a)(2) where: (i) the debtor made numerous transfers on the eve of bankruptcy to other companies under common control; (ii) the debtor's management failed to attempt recovery of transactions that constituted prima facie preferences and fraudulent conveyances; (iii) the debtor failed to close prepetition

books and produced current financial statements nine months after filing; and (iv) the debtor failed to renegotiate a vastly over-market working capital loan. Sharon Steel, 871 F.2d at 1228. The court in Sharon Steel stated that "Sharon's management appears to have engaged on the eve of bankruptcy in a systematic syphoning [sic] of Sharon's assets to other companies under common control. . . . [S]uch behavior raises grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to Sharon's creditors." Id. at 1228.

57.     On similar facts, the court appointed a chapter 11 trustee in In re Humphreys Pest Control Franchises, Inc., 40 B.R. 174 (Bankr. E.D. Pa. 1984). In that case, the officers and principals of the debtor were the same as those of the parent corporation, which was a debtor in a separate bankruptcy case. Evidence presented by the party moving for appointment demonstrated that over $650,000 of the debtor's assets was transferred to the debtor's parent corporation during the year preceding the bankruptcy filing. Id. at 175. Additionally, after the commencement of the bankruptcy case, another $125,000 had been transferred from the debtor to its parent corporation. Id. The court in Humphreys found that "the transfers represent a serious depletion of the debtor's assets," and that "the debtor's reports of cash receipts and disbursements contain no justification for the amounts being transferred by the debtor to its parent corporation." Id. at 177. The court also noted that "an obvious conflict of interest exists in the management of the two . . . corporations because the officers and principals of the parent corporation are the same individuals as the officers and principals of the debtor." Id. As a result, the court appointed a trustee, stating that "as a disinterested party, the trustee can monitor the relationship between the debtor and its parent corporation, establish controls over the transfer of cash assets, and insure that the assets of the estate are not being depleted. To allow current

management to remain in control of the debtor's operations could otherwise work a serious harm to creditors." Id.

58.     More recently, the Bankruptcy Court for the District of Arizona in In re Products Int'l Co., determined that the appointment of a chapter 11 trustee was in the best interests of the debtor and its estate, due to "improper pre-petition transfers" by the debtor's principal, which the court found to be an "egregious violation of the fiduciary duty owed by the principal to the debtor and its creditors" and "a clear example of the gross mismanagement of the Debtor." See In re Products Int'l Co., 395 B.R. 101, 111-12 (Bankr. D.Ariz. 2008). Specifically, in Products Int'l, one of the debtor's principals transferred nearly $700,000 to a company owned by himself and another $120,000 to himself and his wife personally prior to the commencement of the debtor's bankruptcy case. Id. at 105. The court in Products Int'l noted that the principal was unable to provide a reasonable explanation or a legitimate business reasons for such transfers and that the transfers were "detrimental to the creditors and [the debtor's] estate." Id. at 112. Because there was "no one at the helm of the Debtor to navigate the Debtor successfully through its daily operations, the reorganization process, or the long-term decisions that must be made for the Debtor to remain financially viable in the future," the court ordered the appointment of a chapter 11 trustee that was "familiar with the Debtor's type of operations." Id. at 111, 112.

59.     Like the aforementioned cases, Mrs. Davis respectfully submits that there is more than adequate "cause" for the appointment of a chapter 11 trustee in this case and that such appointment is in the interests of creditors and other interests of the estate as a result of the aforesaid conduct of the Debtor.

## THE AUTOMATIC STAY SHOULD BE MODIFIED PURSUANT TO SECTION 362(d)(1) OF THE BANKRUPTCY CODE TO PERMIT THE MATRIMONIAL ACTION TO PROCEED TO JUDGMENT ON ALL ISSUES

60. Although the Debtor has already agreed by Stipulation to modify the automatic stay[12] and Mrs. Davis requests that the Court approve the Stipulation annexed hereto as Exhibit "A", to the extent any creditor or other party in interest raises any issues, the Court should enter an order modifying the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code to permit the Matrimonial Court to conclude the Matrimonial Action by issuing rulings on the matrimonial issues, including equitable distribution, but leaving enforcement of any judgments to this Court during the pendency of this case. Similar relief has been granted by this Court and by the Bankruptcy Court for the Eastern District of New York. See In re Cole, 202 B.R. 356 (Bankr. S.D.N.Y. 1996) (granting relief from stay to permit matrimonial action between debtor and non-debtor spouse to proceed to judgment, including on equitable distribution, but retaining jurisdiction to enforce judgments of the matrimonial court in the bankruptcy court); In re Taub, 413 B.R. 55 (Bankr. E.D.N.Y. 2009) (same). In finding in favor of stay relief in the Cole case, Judge Bernstein noted that "[f]ederal courts, including bankruptcy courts, ordinarily defer to the state courts in matrimonial matters to promote judicial economy and out of respect for the state courts' expertise in domestic relations issues." Cole, 202 B.R. at 361.

61. The Debtor, as the plaintiff in the Matrimonial Action, is the party who initially commenced the Matrimonial Action. In addition, since the commencement of the Matrimonial Action, the Debtor has actively continued pursuit of his rights in the Matrimonial Action in

---

[12] As noted above, on March 29, 2011, the Debtor's counsel signed a Stipulation agreeing to, among other things, modify the automatic stay in all respects to allow unrestricted continuation of the Matrimonial Action and to permit the Matrimonial Court to issue rulings on all matrimonial issues, including but not limited to the Matrimonial Claims, but leaving enforcement of any judgments to this Court so long as this case is pending. Although it is clear that the Debtor agrees that the stay should be modified, the Stipulation was agreed to just prior to filing this Motion and it does not resolve the most significant matrimonial issues. As such, Mrs. Davis felt compelled to seek the relief requested herein pursuant to an Order of this Court. Notwithstanding the Debtor's consent to stay modification, should the Court, any creditor or other party in interest require further support, the argument that follows is relevant.

connection with, among other things, the disputed equitable distribution issue. Since the date of commencement of the action, both the Debtor and Mrs. Davis along with their respective counsel have continued to appear at conferences before the Matrimonial Court and have actively engaged in discussions and negotiations with respect to the disputed equitable distribution issue, among others. Finally, the Debtor recently filed in this Court an application seeking approval to retain special matrimonial counsel to continue to represent him in the Matrimonial Action.[13] In essence, the Debtor has continued to prosecute the Matrimonial Action, which he commenced, uninterruptedly since the date of commencement.

62. Although the Debtor has moved forward with all aspects of the Matrimonial Action, during a recent Conference in the Matrimonial Action on March 8, 2011, the Matrimonial Court suggested that it had concerns regarding the automatic stay due to the Debtor's status as an individual chapter 11 debtor.[14] The Matrimonial Action has been pending since late 2008 and, as the Matrimonial Court noted, is one of the oldest matrimonial cases on its calendar. The Matrimonial Action has been hotly contested since commencement on various issues but especially with respect to equitable distribution. Settlement discussions have been less than productive and the parties are directed to appear in June, 2011 unless this Court modifies the stay and permits the Matrimonial Action to proceed to trial. The Matrimonial Action has unproductively dragged on for over two years. It is essential that the Matrimonial Action come to a conclusion, especially because, as explained in detail above, the Debtor has been causing the rapid dissipation of marital property.

---

[13] This Court approved the retention of special matrimonial counsel for the Debtor by Order dated March 21, 2011 [Docket No. 39].

[14] Neither counsel for the Debtor nor counsel for Mrs. Davis believe that the stay is applicable to the Matrimonial Action, at least with respect to the actions each have taken to date. However, in light of the concerns raised by the Matrimonial Court, counsel for Mrs. Davis thought it prudent to seek an order of this Court modifying the stay in the event that the Matrimonial Action must proceed to trial.

63.     Because of its concerns with the automatic stay, the Matrimonial Court has not been comfortable with exercising appropriate restraints on marital property that are normally well within its power.  In light of the rapid dissipation of assets, if the Debtor were not an individual chapter 11 debtor, Mrs. Davis' matrimonial counsel is certain that the Matrimonial Court would have already issued a restraining order on the assets owned by the LLCs or it would have appointed a receiver.  In fact, just as Mrs. Davis was about to seek restraints on marital property, the Debtor conveniently filed this case which raised the Matrimonial Court's concerns with respect to the automatic stay.  Nevertheless, as explained in detail above, because the Debtor's LLCs are non-debtors, this Court does not have full control over the LLCs.  As a result, the Debtor has been able to manipulate both the matrimonial and bankruptcy processes in such a way that there is virtually no oversight or control over the rapid dissipation of assets that may be available to his creditors and to Mrs. Davis.  These are clear litigation tactics that should not be permitted and this Court has the power to stop him.  Accordingly, this Court should enter an order modifying the automatic stay to permit the Matrimonial Court to proceed to judgment on all issues in the Matrimonial Action.

64.     It is clear that the automatic stay does not apply to a proceeding to dissolve a marriage, except to the extent that such proceeding seeks to determine property that is property of the estate.  11 U.S.C. § 362(b)(2)(A)(iv).  It is also clear that all of Mrs. Davis' Matrimonial Claims, including for equitable distribution, are nondischargeable pursuant to sections 523(a)(5) and (a)(15) of the Bankruptcy Code.[15]  11 U.S.C. §§ 523(a)(5), (a)(15).  However, as explained

---

[15] Indeed, pursuant to the Stipulation signed on March 29, 2011, the Debtor agreed, among other things, that the Matrimonial Claims are deemed nondischargeable debts notwithstanding whether (i) such debts are enumerated as exceptions to discharge in section 523 of the Bankruptcy Code and (ii) Mrs. Davis files a complaint objecting to discharge of the Debtor in accordance with the Objection to Discharge Notice or seeks to have a debt declared nondischargeable.  In addition, certain Matrimonial Claims are afforded specific and appropriate priority treatment under the Bankruptcy Code.

130664.00601/7002611v.6

in detail above, the Debtor has virtually no personal assets due to his use of the non-debtor LLCs which own virtually all of the assets he uses and fund nearly all of his living expenses. As a result, it is less clear to what extent the automatic stay applies to equitable distribution as the LLCs assets are not property of the Debtor's estate.

65. However, to the extent that the automatic stay does apply, section 362(d)(1) of the Bankruptcy Code provides that the court shall grant relief from the stay "for cause." 11 U.S.C. § 362(d)(1). Although the term "for cause" is not defined, the Second Circuit has identified several factors to be considered in deciding whether cause exists to modify the automatic stay to allow litigation to proceed in another forum. <u>Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)</u>, 907 F.2d 1280, 1286 (2d Cir. 1990). The traditional stay relief factors as set forth by the Second Circuit in <u>Sonnax</u> are as follows:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

<u>Sonnax</u>, 907 F.2d at 1286. "Not all of these factors will be relevant in every case." <u>Mazzeo v. Lenhart (In re Mazzeo)</u>, 167 F.3d 139, 143 (2d Cir. 1999), and the court need not give equal weight to each factor. <u>See</u> <u>Burger Boys, Inc. v. South St. Seaport Ltd. P'ship (In re Burger Boys, Inc.)</u>, 183 B.R. 682, 688 (S.D.N.Y. 1994). Rather, as several courts have noted, "[w]hen

applying these factors and considering whether to modify the automatic stay, the Court should take into account the particular circumstances of the case, and ascertain what is just to the claimants, the debtor and the estate." In re Keene Corp., 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994). See In re Cole, 202 B.R. 356, 361 (Bankr. S.D.N.Y. 1996); In re Touloumis, 170 B.R. 825, 828 (Bankr. S.D.N.Y. 1994).

66.     Sonnax factor 3, 5, 6, 8 and 9 are not relevant in this case as the Matrimonial Action does not involve the Debtor as a fiduciary, does not involve insurance, does not primarily involve third parties, equitable subordination is not an issue and will not result in a judicial lien avoidable by the Debtor.

67.     Relief from the stay will allow the Marital Court to fix Mrs. Davis' claims against the Debtor thereby resolving significant open issues in the Debtor's bankruptcy case. Because enforcement of any judgment in the Matrimonial Action will be left to this Court, relief from the stay will not interfere with the bankruptcy case. In addition, the Matrimonial Court is a specialized tribunal that routinely handles domestic relations matters and principles of judicial economy favor deferring resolution of matrimonial actions to the matrimonial courts. Further, the Matrimonial Court is fully familiar with the facts in this Matrimonial Action and is prepared to hold a trial in just a few months. Thus, Sonnax factors, 1, 2, 4, 10 and 11, all weigh in favor of stay relief.

68.     Modifying the stay to allow continuation of the Matrimonial Action will not prejudice other creditors because the Matrimonial Court will only continue to judgment, not enforcement, and this Court will retain jurisdiction, while this case is pending, to enforce any judgments ensuring that the rights of other creditors are protected. Accordingly, Sonnax factor 7 also weighs in favor of stay relief.

69.     The Matrimonial Court is an appropriate forum to determine the issues present in the Matrimonial Action, including the question of equitable distribution of the marital property between the Debtor and Mrs. Davis, for several reasons.  The Matrimonial Action has been pending there since 2008, and the Matrimonial Court has experience with both the area of law and this Matrimonial Action.  Further, the resolution of the matrimonial issues may assist the Debtor in formulating his chapter 11 strategy.  Finally, stay relief will be limited to allowing the Matrimonial Court to determine the issues, up to the entry of judgment, but not enforcement, so that the administration of this bankruptcy case and the interests of the parties in the bankruptcy case are not harmed.  Therefore, the final Sonnax factor, factor 12, also weighs in favor of stay relief and thus cause exists for granting relief from the stay with respect to all issues in the Matrimonial Action.

## CONCLUSION

70.     For the reasons set forth herein, Mrs. Davis respectfully requests that the Court enter an order directing the appointment of a chapter 11 trustee pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code.  In addition, Mrs. Davis requests that the Court direct the chapter 11 trustee to establish a budget for the Debtor to prevent further dissipation of assets.  Finally, Mrs. Davis requests that the Court modify the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code to permit the Matrimonial Action to proceed to judgment on all issues, including equitable distribution, with enforcement to take place in this Court during the pendency of this case by approving the Stipulation annexed hereto as Exhibit "A".

## NOTICE

71.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to the Debtor; (iii) the Debtor's twenty largest unsecured creditors; (iv)

130664.00601/7002611v.6

counsel to Zimco Holdings LLC; (v) Park Avenue 1055 LLC; and (vi) on all other parties required to receive service under Rule 2002 of the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York. In light of the nature of the relief requested herein, Mrs. Davis submits that no other or further notice is necessary.

72.     This Motion complies with the requirements contained in Rule 9013 of the Local Bankruptcy Rules of the Southern District of New York.

NO PRIOR REQUEST

73.     Mrs. Davis has not previously sought the relief requested herein from this or any other court.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

130664.00601/7002611v.6

WHEREFORE, Mrs. Davis respectfully requests entry of an order, substantially in the form annexed as Exhibit "C": (i) directing the appointment of a chapter 11 trustee pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code, (ii) directing the trustee to establish a budget for the Debtor, (iii) modifying the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code to permit the Matrimonial Action to proceed to judgment on all issues, including equitable distribution with enforcement to take place in this Court during the pendency of this case by approving the Stipulation annexed hereto as Exhibit "A"; and (iv) granting such other and further relief as is just and proper.

Dated: April 1, 2011
New York, NY

Respectfully submitted,

BLANK ROME LLP

By:   */s/ Michael Z. Brownstein*
Michael Z. Brownstein
Scott F. Budzenski
The Chrysler Building
405 Lexington Avenue
New York, NY  10174-0208
Telephone:  (212) 885-5000
Facsimile:  (212) 885-5001

*Attorneys for Diane Davis*

130664.00601/7002611v.6